Community College of Philadelphia, Appellant *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board et al., Appellee.

Argued June 1, 1981, before President Judge CRUMLISH and Judges ROGERS and WILLIAMS, JR., sitting as a panel of three.

630

*Howard R. Flaxman*, with him *William A. White-side, Jr., Nochem S. Winnet*, and *Barnett Satin-sky, Fox, Rothschild, O'Brien & Frankel*, for appellant.

*Anthony C. Busillo, II*, Assistant Attorney General, with him *James L. Crawford, Donald A. Wallace, Susan Shinkman*, and *Stephen A. Sheller*, Assistant Attorneys General, for appellee, Pennsylvania Labor Relations Board.

*Michael Brodie, Freedman and Lorry, P.C.*, for appellee, Faculty Federation of the Community College of Philadelphia.

*Jason S. Shapiro*, with him *J. Thomas Menaker, McNees, Wallace & Nurick*, of counsel, *Sheldon Elliot Steinbach*, for Amicus Curiae, Pennsylvania Association of Colleges and Universities, American Council on Education and American Association of Community and Junior Colleges.

*Thomas H. M. Hough*, for Amicus Curiae, Community College of Allegheny County.

*Jerome H. Gerber,* with him *Elliot A. Strokoff,* for Amicus Curiae, The Pennsylvania AFL-CIO, The Association of Pennsylvania State College and University Faculties, The American Federation of Teachers, The Pennsylvania Federation of Teachers, and Philadelphia AFL-CIO Council.

OPINION BY JUDGE ROGERS, July 20, 1981:

The Community College of Philadelphia (College) appeals from an order of the Court of Common Pleas of Philadelphia County affirming the order of the Pennsylvania Labor Relations Board (PLRB) certifying the Faculty Federation of the Community College of Philadelphia, Local 2026, American Federation of Teachers, AFL-CIO (Union) as the exclusive bargaining representative of a unit of professional employees to which we will hereafter sometimes refer as "adjunct faculty" consisting in the main of visiting lecturers and part-time instructors at the College. After a thorough review of the relevant legal authorities and the record consisting of more than a thousand pages of testimony and exhibits made during six days of evidentiary hearings before a hearing examiner, we affirm the order of certification on the thorough and well-reasoned opinion of Judge GELFAND for the Court below, docketed at No. 2008, May Term 1979.

However, the College and amici curiae[1] have ascribed particular significance on the occasion of this appeal to the issue of whether the visiting lecturers and part-time instructors are persons whose work rela-

_____
[1] The Community College of Allegheny County, the Pennsylvania Association of Colleges and Universities, the American Council on Education, and the American Association of Community and Junior Colleges have submitted briefs in support of the position of the Community College of Philadelphia. The Pennsylvania AFL-CIO, the Association of Pennsylvania State College and University Faculties, the American Federation of Teachers, the

632

tionship with their employer is so casual that they
have no right under the Public Employe Relations Act
(PERA)[2] to bargain collectively. We will treat this
issue here in a more comprehensive manner than the
chancellor may have felt was warranted in view of the
many issues before him which he was required to ad-
dress.

Section 401 of PERA grants public employees the
right "to organized, form, join, or assist in employe
organizations or to engage in lawful concerted ac-
tivities for the purpose of collective bargaining or
other mutual aid and protection or to bargain collec-
tively through representatives of their own free choice
. . ." PERA pertinently to this case defines public
employees simply as "individual[s] employed by a
public employer."

Although, as seen, the statutory definition of public
employees is broad, the PLRB has consistently exclud-
ed from the protection of PERA employees whose re-
lationship with the public employer is found to be
"casual". *See Lancaster County,* 11 Pa. P.E.R. ¶11077
(1980) (judicial law clerks); *St. Mary's Borough,* 8 Pa.
P.E.R. 252 (1977) (on-call parking meter repairman);
*Richland School Board,* 8 Pa. P.E.R. 76 (1977) (one-
year replacement teacher); *York County Vocational-
Technical School,* 6 Pa. P.E.R. 198 (1975) (teachers of
one-time, ad hoc, evening school courses).[3] The PLRB

Pennsylvania Federation of Teachers, and the Philadelphia AFL-
CIO Council have submitted a joint brief in support of the PLRB's
decision.

[2] Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §1101.101
*et seq.*

[3] The origin of this extra-statutory exclusion is not altogether
clear and analysis is further muddled by the parties interchangeable
reference to authorities presenting the issue of the casualness of the
employment relationship in a variety of contexts.

It is unexceptional that on the facts of a particular case casual
employees may not share a sufficient community of interest (as re-

has described casual employees as "those who have little likelihood of re-employment and little frequency of

quired by Section 605 of PERA) to warrant their inclusion in a bargaining unit whose members enjoy greater permanency and stability of position. *See, e.g., Erie County Area Vocational-Technical School v. Pennsylvania Labor Relations Board*, 52 Pa. Commonwealth Ct. 388, 417 A.2d 796 (1980) ; *Northumberland County*, 3 Pa. P.E.R. 69 (1973). This issue is frequently litigated in the form of a unit clarification petition, *see, e.g., School District of the Township of Millcreek*, 10 Pa. P.E.R. ¶10049 (1979), or in the initial determination of a unit's appropriateness. *See, e.g., Student Services, Inc. (Edinboro State College)*, 7 Pa. P.E.R. 73 (1976).

In many cases a previously certified units is expressly limited to "regular" employees and the Board's determination that a causal employee may not be included in the unit follows from the restrictive certification definition. *See, e.g., West Jefferson Hills School District*, 6 Pa. P.E.R. 117 (1975).

Finally, the relationship between one who seeks to be included in a bargaining unit and the public employer may be so tenuous as to negate the inference that any employment is involved. *See, e.g., St. Mary's Borough*, 8 Pa. P.E.R. 252 (1977) (two college students employed as laborers during the summer preceding the certification election. No evidence of any intention that they were to be re-hired.)

It must be noted that none of these authorities squarely decides the issue of whether a group of individuals employed by a public employer for a fixed term have the right to bargain collectively. Private sector decisions are also of doubtful usefulness since the definition of covered employees contained in the National (and Pennsylvania) Labor Relations Act differs substantially from that here at issue.

Our decision in this case is limited to affirming the PLRB's determination that the circumstances here presented show that the College's adjunct faculty members have a reasonable expectation of continued employment and, therefore, that they are not casual employees under the test all parties agree is appropriate for application. Query why the broad definition of employee in PERA as any individual employed by a public employer should not be held to include an individual employed by a public employer for a fixed term of employment without expectation of continued employment beyond the term? We do not answer this question in this case because it is not necessary to do so.

re-employment." *Student Services, Inc. (Edinboro State College),* 7 Pa. P.E.R. 73 (1976) *rev'd on other grounds sub nom Employees of Student Services, Inc. Appeal,* 4 Pa. Commonwealth Ct. 220, 411 A.2d 569 (1980). In *Westmont Hilltop School District,* 8 Pa. P.E.R. 236 (1977) quoting *Dauphin County Commissioners,* 7 Pa. P.E.R. 7 (1976) the PLRB wrote:

> the only requirement is that of a 'regularity of employment' which must exist with a fair degree of frequency as distinguished from casual employes who perform an occasional job for a temporary purpose or are hired as a matter of special engagement.

Thus, the inquiry is factual; and demands examination of all the circumstances of the questioned employment relationship. The PLRB has refused to give controlling significance to the terms of the employment contract, *Northeastern School District,* 9 Pa. P.E.R. ¶9102 (1978), or to create any bright arbitrary line to be passed, such as number of hours worked, as showing that the employment is not casual. *Dauphin County Commissioners, supra; Radnor Township School District,* 6 Pa. P.E.R. 30 (1975).

Both visiting lecturers and part-time instructors at the College perform, for the most part, the same functions as members of the full-time faculty, that is prepartion of lessons; classroom instruction; preparation, administration, and grading of examinations; and the informal and formal tutoring and guidance of individual students. The evidence is conflicting as to the role played by the part-time instructors in the tasks of departmental planning and collegial self-governance. Visiting lecturers are fully involved in these processes.

Adjunct faculty are essential to a large proportion of the public service provided by the College. Three hundred forty-four part-time instructors were em-

ployed by the College in 1977 to teach in excess of twenty-five per cent of all course sections. These instructors teach nearly ninety per cent of the classes in the College's Community Services Division which, at twenty-five locations throughout Philadelphia, provides flexible credit and non-credit courses of immediate interest to various groups in the city as well as preparation for the High School Equivalency Examination. In addition, seventy-two visiting lecturers were employed in 1977 and although separate figures for visiting lecturers are unavailable it is clear that the total contribution of both categories of adjunct faculty is significant. In 1970 approximately eighty-eight adjunct faculty were employed by the College. Approximately four hundred forty-six adjunct faculty (including special tutors) were employed in 1977.

The primary difference between visiting lecturers and part-time instructors is in their respective teaching loads and remuneration. Visiting lecturers carry a full teaching load of twenty-four academic credits per year and receive a salary the same (about $19,000 a year) as regular full-time members of the faculty although certain fringe benefits received by the latter group are not included. Part-time instructors teach a maximum of nine classroom "contact" hours in each of two academic semesters and are paid $275.00 per contact hour (compensation totalling at best about $5,000 a year) with no fringe benefits.

At the heart of the present controversy is the method chosen by the College to hire these employees. Individual adjunct faculty members are offered contracts of employment for a fixed term; in the case of visiting lecturers the term of employment is one academic year; part-time instructors are hired for one or two semesters. The employment contracts under which the adjunct faculty members are hired and correspondence from the College emphasize that the Col-

636

lege is not bound to rehire anyone for an additional term. The College asserts that this practice is necessitated by their "open enrollment" policy which leave unresolved until the opening day of classes each semester exactly which courses and course sections will be offered. As a consequence, the College says, the adjunct faculty should be found to be casual employees.

However, substantial evidence was adduced which tended to show that many of the adjunct faculty members have been repeatedly rehired,[4] that individual department chairmen are required by the college to compile and to rely upon a list of former adjunct faculty to be used as a hiring "pool", and that

[4] The Board's following findings of fact are supported by the College's exhibits numbered 3, 4, 5 and 6, (VL = visiting lecturer, PTI = part-time instructor.

48. That of 74 VL's employed at the College in the Fall of 1975, 35 or 47% were still employed as VL's in the Spring of 1977.

49. That of 72 VL's employed at the College in the Spring of 1977, 61 or 87.5% had at least one semester of prior service at the College. The prior service analysis of these VL's is as follows:

| No of Employees | No. of Semester of prior service as VL's | % by Semester |
|---|---|---|
| 9 | 0 | 12.5 |
| 18 | 1 | 25.0 |
| 9 | 2 | 12.5 |
| 16 | 3 | 22.2 |
| 8 | 4 | 11.1 |
| 5 | 5 | 6.9 |
| 5 | 7 | 6.9 |
| 2 | 8 | 2.8 |

50. That of 354 PTI's employed at the College in the Fall of 1975, 133 or 37.5% were still employed as PTI's in the Spring of 1977.

51. That of 344 PTI's employed by the College in the Spring of 1977, 250 or 73% had at least one semester of prior service at the College. The prior service analysis of these employes is as follows:

despite the practice of open enrollment the pupil population at the College and, therefore, the number of adjunct faculty, has stabilized and can be accurately predicted from year to year.[5] Several adjunct faculty

| No. of Employees | No. of Semesters of prior service as PTI's | % by Semester |
|---|---|---|
| 94 | 0 | 27.33 |
| 66 | 1 | 19.19 |
| 46 | 2 | 13.37 |
| 35 | 3 | 10.17 |
| 21 | 4 | 6.10 |
| 22 | 5 | 6.40 |
| 16 | 6 | 4.65 |
| 11 | 7 | 3.20 |
| 8 | 8 | 2.33 |
| 6 | 9 | 1.75 |
| 4 | 10 | 1.16 |
| 2 | 11 | .58 |
| 3 | 12 | .87 |
| 3 | 13 | .87 |
| 2 | 14 | .58 |
| 2 | 15 | .58 |
| 2 | 17 | .58 |
| 1 | 22 | .29 |

52. That 11 of the VL's teaching in the Spring of 1976 returned as full-time faculty in the Fall of 1976, and that over the past 1 1/2 years, 4 or 5 PTI's became VL's.

[5] Dr. Allen T. Bonnell, president of the College, testified as follows:

Q: What has been the student body enrollment in Community College during this past year?

A: Roughly, six thousand full-time students and approximately the same number part-time students.

Q: And what was it the year previous to that?

A: It was about one per cent less than that.

Q: And what do you anticipate it to be this coming year?

A: I would be surprised if we get the same number of students we had this year.

Q: So it will be something less?

A: It might be something less.

638

members testified that indefinite re-employment of capable individuals is virtually assured.[6]

We agree with the PLRB that the focus of the inquiry must be on whether the adjunct faculty members have a reasonable expectation of continued employment based on the showing that the nature of the College's personnel needs and its hiring practices have in fact provided regular employment to those who want it; or whether no such expectation could be entertained in the face of the limited terms of their

---

Q: Can you give me a guesstimate of what your projections are?

A: It's a very unpredictable market and it might be a per cent or two short, less than last year.

Q. Is it reasonable to—?

A: At least at the rate the applications are coming in.

Q: So then, you anticipate really fairly level stable employment for your faculty?

A: It looks to me as though we have leveled off.

[6] For example, Robert Stelling, a part-time instructor at the College since 1972 testified:

A: . . . So if you do your job well and you are academically competent and if the students don't make placards and they like you, Department Heads will rehire you.

Q: And if you do that, you will be continued to be re-employed as a part timer?

A: You most probably will and if you happen to do something really outstanding and become notorious for it, you won't be let go, but I have seen people not be rehired or not be hired for more than one semester because they never came to or came spasmodically, but those who came readily and did their job and who were seen actively doing what they were employed to do, most of them were rehired. . . .

Q: And is it a very isolated exception that you wouldn't be?

A: I have seen where exceptions have occurred but it's very rare.

contracts and the express disclaimer of any obligation to rehire. *Dauphin County Commissioners, supra.*

In this regard, the National Labor Relations Board has stated that "a regular pattern of continuing employment in past academic years can be indicative of the type of expectation of future employment necessary to establish a continuing interest in the unit." *C. W. Post Center,* 198 NLRB 453, 454, 80 LRRM 1738, 1739 (1972). *See also Fordham University,* 193 NLRB 134, 78 LRRM 1177 (1971). We find this reasoning to be persuasive. It is clear that the terms of the employment contracts alone cannot determine whether the adjunct faculty are casual employees. To hold otherwise would permit the College to determine the membership of the bargaining unit.

The PLRB's finding that the adjunct faculty were not purely casual employees but that they were persons with a reasonable expectation of continued employment is supported by the record and is, moreover, consistent with other of its determinations where:

> the record show[ed] that many of [the] employees work[ed] for periods of time which indicate[d] repetitive employment and which permit[ed] them reasonably to anticipate reemployment in the near or foreseeable future.

*Juilliard School,* 208 N.L.R.B. 153, 154, 85 LRRM 1129, 1130 (1974); *see, e.g., Dauphin County Commissioners, supra; Radnor Township School District, supra.* Each of these cases necessarily turns on its particular facts in all their complexity and we continue to give deference to the expertise of the PLRB in the assessment of those facts. *Cf. Keene State College Association v. State of New Hampshire,* 119 N.H. 1, 396 A.2d 1099 (1979).

Order affirmed.

640

ORDER

AND Now, this 20th day of July, 1981, the order of the Pennsylvania Labor Relations Board is affirmed.