Commonwealth of Pennsylvania, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board, Respondent.

Fraternal Order of Police et al., Intervenors.

International Union, United Plant Guard Workers of America, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board, Respondent. Commonwealth of Pennsylvania, Intervenor.

Argued June 2, 1981, before President Judge
CRUMLISH, JR. and Judges MENCER, BLATT, WILLIAMS,
JR. and CRAIG.

*Debra K. Wallet,* Assistant Attorney General, with her, *John D. Raup,* Assistant Attorney General, for petitioner, Commonwealth of Pennsylvania.

*M. Glenn Jeakle,* with him *Michael H. Small,* for petitioner, International Union, United Plant Guard Workers of America.

*James L. Crawford,* Assistant Attorney General, with him *Anthony C. Busillo, II,* Assistant Attorney General, for respondent, Pennsylvania Labor Relations Board.

*Gary M. Lightman, Mancke & Lightman,* for intervenor, Fraternal Order of Police et al.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., February 16, 1982:

This is a consolidated appeal of the Commonwealth of Pennsylvania (Commonwealth) and the International Union, United Plant Guard Workers of America (Union) from a Pennsylvania Labor Relations Board (Board) final order certifying the Fraternal Order of Police, Lodge No. 85 (FOP), as the exclusive bargaining representative of the Commonwealth Capitol Police.[1] We affirm in part and reverse in part.

---

[1] The Capitol Police are within the Department of General Services. The proposed bargaining unit is comprised of approximately 150 full-time and regular part-time employees in the Harrisburg Capitol complex and the state office buildings in Philadelphia, Pittsburgh and Scranton. This unit includes the civil service classifications of Police Officers IV (Lieutenants), Police Officers III (Sergeants), Police Officers II and Police Officers I, and excludes the Superintendent and Captain.

The FOP filed a representation petition pursuant to Act 111.[2] At that time, the Union was certified under the Public Employe Relations Act[3] (PERA or Act 195) as the exclusive collective bargaining representative of all Police Officers I and II and as the exclusive "meet and discuss" representative of all Police Officers III, some of which are Capitol Police. The Board denied the Union's motion to stay representation proceedings until the disposition of certain unfair practice charges.[4] After a Board determination that the employees are "policemen" under Act 111, the Capitol Police elected the FOP as its representative.

Our scope of review is limited to a determination of whether or not the Board's findings are supported by substantial and legally credible evidence, and whether or not its conclusions based on facts are reasonable and not capricious, illegal or arbitrary. *Erie City Area Vocational-Technical School v. Pennsylvania Labor Relations Board,* 52 Pa. Commonwealth Ct. 388, 396, 417 A.2d 796, 798 (1980).

I

The Petitioners' threshold claim in both cases is that the Board has no authority to determine the employees' status as "policemen" under Act 111. Citing *Hartshorn v. County of Allegheny,* 9 Pa. Common-

---

[2] Act of June 24, 1968, P.L. 237, 43 P.S. §217.1 (Supp. 1981-82), which provides for collective bargaining between policemen and their public employers, and mandates binding arbitration, with no right to strike, if bargaining reaches an impasse.

[3] Act of July 23, 1970, P.L. 563, 43 P.S. §1101.101 (Supp. 1965-80).

[4] The Union charged that the FOP interfered with the employees' right to select a bargaining representative and that the Commonwealth fostered the FOP's formation. The FOP claimed that the Union and the Commonwealth prematurely extended their existing collective bargaining and memorandum agreements in the face of the representation petition.

wealth Ct. 132, 304 A.2d 716, *aff'd*, 460 Pa. 560, 333 A.2d 914 (1975),[5] they assert that only a court is authorized to make this determination. *Hartshorn*, however, clearly does not mandate such procedure. Rather, the Pennsylvania Supreme Court held that employees *"need not* seek an initial determination from the . . . Board as to whether they are policemen within the meaning of Act 111. . . ." 460 Pa. at 563, 333 A.2d at 915. (Emphasis added.) The correlative is that one *may* seek an initial administrative determination. *Hartshorn* indicates that the Board has concurrent jurisdiction with the Court to so act.

The Petitioners cite *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977), to buttress their claim.[6] *Fire Officers*, however, although limited to a holding that the Board has "jurisdiction . . . *to conduct a representation election"* under Act 111,[7] is distinguishable since the employees' status in *Fire Officers* was not at issue.[8]

---

[5] In *Hartshorn*, when the county commissioners did not respond to a bargaining request under Act 111, the county detectives sought mandamus to compel arbitration. The commissioners argued that the "policemen" status should be determined by the Board and not by the Court.

[6] *Fire Officers* demonstrated the difficulty in delineating Act 111 rights and duties. Whereas the Pennsylvania Labor Relations Act (PLRA), Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §211.1, provides an explicit procedure for selecting a collective bargaining representative, Act 111, which covers collective bargaining for a limited group of public employees, lacks such a specific procedure. The Supreme Court resolved this inconsistency by holding that Act 111 be construed *in pari materia* with PLRA. *Fire Officers* at 555, 369 A.2d at 261.

[7] 470 Pa. at 558, 369 A.2d at 261 (emphasis added).

[8] In *Fire Officers*, the Association filed to represent employees already represented under Act 111 by another labor organization, whereas here, the FOP seeks to represent employees under Act 111 who are certified for Act 195 representation.

A labor organization's right to represent an employee unit depends in part on its legal standing (*i.e.*, whether it is a "labor organization" under the statute), which is initially addressed by the Board. Since the law strongly favors regularity of process, *Fraternal Order of Police v. Shapp*, 22 Pa. Commonwealth Ct. 267, 271, 348 A.2d 502, 504 (1975), it is anomalous and policy-defeating to require a judicial declaration of the employees' status when the Board initially determines the labor organization's status.[9]

We are guided by a policy of encouraging collective bargaining[10] and promoting orderly employment relationships,[11] and are required by PLRA, which is read *in pari materia* with Act 111, to construe the law liberally.[12] Therefore, to resolve these disputes with procedural and legal certainty, we hold that the Board has

---

[9] In *Venneri v. County of Allegheny (Venneri I)*, 5 Pa. Commonwealth Ct. 105, 108, 289 A.2d 523, 524 (1972), we held the definition of "policemen" to be a legal question. We reasoned that it was for the Court in the first instance to determine the employees' status and, therefore, it was neither necessary nor appropriate for the Board to make this initial determination. Accordingly, we concluded mandamus to be a proper remedy. *Venneri I*, however, is not controlling because:

(1) *Venneri I* did not involve the need of a representation election;

(2) *Venneri I* pre-dated *Hartshorn*, which, as discussed above, indicated the Board's concurrent jurisdiction of the employees' status issue; and

(3) Since mandamus lies only where there exists a clear legal right in the plaintiff, a corresponding duty in the defendant and a lack of any other appropriate remedy, mandamus is not proper where, as here, a declaration of the employees' standing, by itself and without an election, would not create a clear right in the FOP to represent the Capitol Police in bargaining.

[10] 42 P.S. §211.2(c).

[11] 43 P.S. §1101.101.

[12] 43 P.S. §211.2(d).

jurisdiction concurrent with the Court to determine the employees' Act 111 status.[13]

## II

Both Petitioners contend that the Capitol Police are "guards" under PERA[14] rather than "policemen" under Act 111. Since Act 111 does not define "policemen," the issue must be resolved after full consideration of the particular factual posture. *Hartshorn,* 9 Pa. Commonwealth Ct. at 136, 304 A.2d at 719. Our primary focus is on the Administrative Code,[15] which defines the employees' role, as indicative of the legislative intent to vest the employees with police power. *See Hartshorn,* 460 Pa. at 563-64, 333 A.2d at 915-16. Section 2416(e) of the Code specifically authorizes the Capitol Police to exercise:

the same powers as are now or may be hereafter exercised under authority of law or ordinance by the police of the cities of Harrisburg, Pittsburgh and Philadelphia [and] municipalities in Dauphin County wherein state buildings are located. . . .

This demonstrates clearly the legislature's intention to vest the Capitol Police in Harrisburg, Philadelphia and Pittsburgh with police powers.

We note the employees' function as a police unit and the authority they exercise. In addition to protecting Commonwealth property, the Capitol Police must enforce good order on[16] and exclude disorderly persons from[17] Commonwealth property. The officers are required to remove vagrants and trespassers, by force

---

[13] The Court, however, is the ultimate authority on the issue. Judicial review of the Board's decision is available.

[14] 43 P.S. §1101.604(3).

[15] Act of September 28, 1965, P.L. 553, *as amended,* 71 P.S. §646(e).

[16] 71 P.S. §646(a).

[17] 71 P.S. §646(c).

if necessary,[18] and "to arrest any person who shall damage . . . the buildings . . . *or commit any other offense* . . . on state grounds. . . ."[19] The record supports that a Capitol Police applicant must have one year's police experience or its equivalent and must pass the civil service examination. The officers receive firearms training and must requalify in order to bear a weapon. The Capitol Police issue citations for parking violations on Commonwealth property and the Capitol Police in Harrisburg may cite for moving violations which occur on the Capitol Complex streets and are responsible for traffic control in the Complex. The officers investigate automobile accidents within their jurisdiction. Although they do not patrol residential property, Capitol Police may be dispatched outside their jurisdiction in the event of dire emergency.

When vesting a group with police powers and duties, the Legislature does so with specificity. *Venneri v. County of Allegheny (Venneri II)*, 12 Pa. Commonwealth Ct. 517, 527, 316 A.2d 120, 125 (1974).[20] The Legislature has clearly vested the Capitol Police in Harrisburg, Philadelphia and Pittsburgh with such powers and duties, and these employees have functioned as a police unit.[21] Therefore, the Board is cor-

---

[18] 71 P.S. §646(g).

[19] 71 P.S. §646(h). (Emphasis added.)

The appellants discount the arrest authority because of the infrequency of arrests. This is not dispositive. It is sufficient that this authority is vested in the Capitol Police and that such power is exercised.

[20] In *Venneri II* we held that police functions performed by Allegheny County deputy sheriffs were incidental to their primary duty to the courts. A hingepin for our decision was that the deputy sheriffs were not *required* to render police service. Here, however, the duties are not incidental to the responsibilities of the Capitol Police since such are statutorily mandated.

[21] We reject the Commonwealth's claim that the Capitol Police are non-critical employees. That the Police enforce order and protect individuals on Commonwealth property directly contributes to

rect in concluding that the employees are "policemen" under Act 111[22] *as far as* the Capitol Police in Harrisburg, Philadelphia and Pittsburgh are concerned. However, insofar as the enabling legislation, *i.e.*, Section 2416 of the Administrative Code, does not refer to the employees stationed at the state office buildings in Scranton, those individuals are *not* "policemen."[23]

## III

The Petitioners assert that the Union's prior Act 195 certification bars the FOP's representation petition until the Union is decertified.[24] Under Section 607 of PERA,[25] the FOP lacks standing to file for the Union's decertification. A representation petition, however, filed by a rival organization, followed by that organization's election, displaces the incumbent organization and substitutes the new organization as the

the smooth functioning of the state. The "community," which would be endangered by a Capitol Police strike, consists of Commonwealth employees, including elected officials, individuals transacting business with the Commonwealth on state property and recipients of services provided on state grounds. The Commonwealth's assertion that, in event of a strike, alternative means of providing emergency services would be available is not persuasive. Equally unpersuasive (and unreasonable) is the suggestion that, if a strike occurred, the state buildings simply could be locked. Continued access to these facilities and the protection of individuals connected with and utilizing the same are of paramount public interest.

[22] We find that the Board's determination that Capitol Police are "policemen" under Act 111 is supported by substantial and legally credible evidence.

[23] We are at a loss to explain why the Legislature has decided to preclude employees protecting Commonwealth buildings and property in Scranton from the purview of Section 2416(e) of the Administrative Code. It is not, however, our position to comment on a matter of legislative discretion.

[24] Act 111 is silent on the effect of a prior Act 195 certification.

[25] 43 P.S. §1101.607 limits standing to file decertification petitions to public employees (if supported by a 30% showing of interest) and a public employer alleging a good faith doubt of the representative's majority status.

unit's exclusive representative.[26] By filing an Act 111 petition[27] and winning the election, the FOP displaced the Union, thereby obviating the need to utilize decertification procedures under PERA, which in any event are statutorily unavailable to the FOP.[28]

The Petitioners argue that *F.O.P. v. Shapp*,[29] *supra*, sets forth, as an exclusive procedure, Act 195 decertification prior to an Act 111 representation filing. There we held that an initial decertification under Act 195 (which would remove outstanding Act 195 obligations) followed by an Act 111 bargaining request was "an adequate remedy available. . . ." to the FOP. *Id.* at 271, 348 A.2d at 504. *F.O.P. v. Shapp*, however, is not controlling on this issue since the FOP cannot petition for decertification under PERA.[30]

---

[26] *See* 43 P.S. §1101.603(c) which permits an employee organization to file for representation if supported by a 30% showing of interest and if filed during the appropriate "window period" as provided in 43 P.S. §1101.605(7)(ii).

[27] PLRA, which is read *in pari materia* with Act 111, provides for the filing of a representation petition by a labor organization. 43 P.S. §211.7(c).

[28] The petitioners question the legal propriety of implementing the displacement of an employee organization certified under Act 195 by Act 111 procedures. In *Fire Officers*, the Court recognized that Act 111 employees are in no respect covered by Act 195. *See* 43 P.S. §1101.301(2) which expressly excludes policemen from the definition of "public employee." The implication is that, once employees are determined to be "policemen," they are removed from Act 195 coverage. Once this occurs, the focus is not on Act 195 decertification, but on Act 111 certification. This certification was accomplished by the filing for Act 111 representation and the resultant successful election.

[29] In *F.O.P. v. Shapp*, after being certified as the Act 195 bargaining representative for Liquor Control Board enforcement officers, the FOP revealed its intention to bargain under Act 111. The Commonwealth, however, refused to bargain under Act 111 because of the outstanding Act 195 certification. The FOP then sought mandamus to compel Act 111 negotiations.

[30] *See* 43 P.S. §1101.607.

The Board's conclusion that the Act 111 certification has the effect of decertifying the Union under Act 195 is consistent with Pennsylvania labor law. Since "employees covered by Act No. 111 are not in any respect covered by PERA (Act 195) . . . ," *Fire Officers*, 470 Pa. at 558, 369 A.2d at 262, once the employees were determined to be "policemen" under Act 111, those employees' Act 195 rights were dissolved by statutory definition. Therefore, the Union's standing as their representative, which was necessarily related to the employees' Act 195 status, was also dissolved. Although technically not an Act 195 "decertification," the effect is similar. Further, once the employees are found to fall within Act 111, it would be unlawful for the Union to represent them.[31]

We reject the assertion that the FOP's representation petition is a collateral attack on the Union's prior cerification. There is neither the identity of issues nor the prior full opportunity to litigate the issues, as required by *Safeguard Mutual Life Insurance Co. v. Williams*, 463 Pa. 567, 574, 345 A.2d 664, 668 (1975), which would prevent the FOP from filing its petition. Also, since the Board is a *forum* for resolving representation disputes rather than a *party* to such disputes, the Board cannot be collaterally estopped from considering the petition.

## IV

The petitioners claim that the existing bargaining agreements bar the FOP's petition. Act 111 contains no "contract bar rule" as is found in Act 195[32] and

---

[31] 43 P.S. §1101.604(3) provides that organizations of guards may not be affiliated with any other organization representing or including as members, persons outside of the organization's classification.

[32] 43 P.S. §1101.605(7)(ii).

536

PLRA.[33] *Fire Officers,* however, implicitly mandates that such a rule be incorporated into Act 111. In *O'Hara Township,* 9 PPER Para. 9073 (1978), the Board first adopted an Act 111 contract-bar rule, but held that such would not be applied retroactively. Since the *O'Hara Township* decision was issued on March 10, 1978, the Board properly refused to bar the FOP's petition filed on March 14, 1977.

Petitioners next contend that, since *Fire Officers* (which mandated that Act 111 and PLRA be read *in pari materia)* was decided nearly two months prior to the petition's filing, the PLRA contract-bar doctrine should control. After *Fire Officers,* the Board, recognizing the internal inconsistencies under Act 195 regarding the timetables for collective bargaining and the resolution of representation questions,[34] began to integrate PLRA and Act 111 into a rational whole. The Act 111 contract-bar rule adopted in *O'Hara*[35] allows the bargaining process to begin in a timely manner while ensuring that the employer does not bargain with a lame duck incumbent who will be replaced during negotiations by the representative-elect. The Board concluded that, due to the Act 111 mandatory

[33] 43 P.S. §211.7(c). *See also Pennsylvania Labor Relations Board v. Loose,* 402 Pa. 620, 622, 168 A.2d 323, 324 (1961). Under Board decisions, the PLRA contract-bar rule provides for the same 60-90 day "window period" provided in Act 195.

[34] *E.g.,* Act 195 representation petitions must be filed between 60 and 90 days prior to the collective bargaining agreement's expiration. 43 P.S. §1101.605(7)(ii). Act 195 also requires contract negotiations to begin no later than 171 days prior to the public employer's budget submission date. 43 P.S. §1101.801. This has resulted in the bargaining obligation being imposed when outstanding representation questions still remain, thereby leaving the public employer in the situation of not knowing with whom to bargain.

[35] The Act 111 contract-bar rule requires the representation petition to be filed between 30 and 60 days *prior to the commencement of bargaining.*

bargaining timetables,[36] the PLRA contract-bar rule applicable to *private sector* bargaining cannot apply to *public sector* bargaining, which is influenced by annual budgetary constraints. Therefore, since the Act 111 contract-bar rule was designed to implement the mandated bargaining timetable, the Board's failure to incorporate the PLRA contract-bar rule "as is" into Act 111 procedure is proper.[37]

V

Petitioners next assert that the Board erred by failing to adjudicate Act 195 unfair practice charges prior to ordering the election.[38] The postponement of a representation election until outstanding unfair practice charges are resolved—the "blocking charge" doctrine—is discretionary with the Board. We will not review the Board's discretionary acts in the absence of bad faith, fraud, capricious action or abuse of power. *Pennsylvania Social Services Union, Local 668 v. Pennsylvania Labor Relations Board,* 481 Pa. 81, 88-89, 392 A.2d 256, 259-60 (1978).

The Board concluded that the questions raised by the charges were dependent upon the resolution of the jurisdictional issue.[39] The Board also determined that the nature of the alleged conduct, even if proven, would not have such an impact on the election as to require a postponement, and that, in any event, the time elapsed

---

[36] Collective bargaining shall begin at least six months before the start of the public employer's fiscal year. 43 P.S. §217.3.

[37] Since the petition was filed under Act 111, we reject the appellants' claim that the Act 195 contract-bar rule should apply.

[38] The Board denied the Commonwealth's motion to continue representation proceedings pending disposition of these charges on the basis that it was necessary first to establish the employees' status since, if the employees were "policemen" under Act 111, there would be no jurisdiction to determine Act 195 charges.

[39] The parties, being aware of this jurisdictional issue, could have preserved their right to process these charges by filing under both Act 195 and the PLRA.

between the alleged misconduct and the election purged any taint that may have existed. Therefore, the Board did not abuse its discretion.

## VI

The Petitioners claim that the Board failed to establish rules governing Act 111 elections and that this failure is violative of their due process rights. They allege that the absence of a separate and distinct set of Act 111 procedures seriously impairs their ability to challenge the FOP's petition.

*Fire Officers* held that PLRA procedures would also govern Act 111 representation cases:

> We believe that when the Legislature spoke in Act No. 111 of 'labor organizations or other representatives, designated by 50% or more of such policemen . . . ,' it necessarily meant a labor organization *designated in accordance with the provisions and procedures already established by statute and administered by the Labor Board.* (Emphasis added.)

470 Pa. at 556, 369 A.2d at 261. Since Act 111 contains no such procedures, and since it is construed *in pari materia* with the PLRA, there is little doubt that the Court was referring to the regulations promulgated under PLRA.[40] Further, since the Hearing Examiner indicated at the outset that the PLRA regulations would control this matter, the parties were given ample notice. We find no merit to the claim that the Board engaged in *ad hoc* rule making.[41]

---

[40] 34 Pa. Code §93.1.

[41] The Union argues that, if PLRA regulations control this dispute, the PLRA contract-bar rule should also apply. The Union, however, fails to recognize that, since the PLRA contract-bar rule is partially rooted in the decision-making process, its application here would be a clear example of *ad hoc* adjudication. Further, the parties were given a full and fair opportunity to litigate its applicability before the Board.

## VII

The Petitioners' final claims[42] involve the inclusion of Police Officers III (Sergeants) and IV (Lieutenants) into the bargaining unit and the Board's failure to certify a statewide unit comprised of all Commonwealth Police Officers.

The Commonwealth contends that the Board must exclude supervisory employees from the rank and file bargaining unit. Act 111, however, does not define "supervisor" nor does it exclude supervisors from its coverage. The Legislature, by not explicitly excluding policemen with supervisory authority from Act 111, has granted implicitly collective bargaining rights to *all* policemen, notwithstanding rank. Since it is discretionary with the Board to determine the appropriate bargaining unit, and since the Board's conclusion (that Police Officers III and IV employed by the Capitol Police do not exercise managerial authority) is supported by substantial evidence and is neither illegal nor capricious, we hold the unit to be appropriate.[43]

The Commonwealth also contends that the certified unit should be statewide, including all employees classified as "Police Officers," rather than limited to those employed by the Capitol Police. The Board, however, correctly concluded that the Capitol Police, who share a separate community of interest apart from

---

[42] We note the Petitioners' claim that a 50% showing of interest is required to support an Act 111 representation petition is meritless. Section 1 of Act 111 conditions the *right to bargain* upon the representative's selection by at least 50% of the employees. A showing of interest, however, demonstrates only that there is sufficient employee interest to justify further administrative action. Reading Act 111 *in pari materia* with PLRA, a 30% showing of interest sufficiently supports an Act 111 representation petition. *See* 43 P.S. §211.7(c).

[43] The Board, however, properly determined that the Superintendent and Captain could not be included in the unit because of their managerial functions.

Police Officers employed by other Commonwealth agencies, constitutes an appropriate unit standing alone.[44]

CONCLUSION

We appreciate the complexity and uniqueness of the issues presented. The Board is in the unenviable position of fashioning the language and policy considerations of Act 111 and PLRA into a cohesive and workable mechanism.

We affirm the Board's final order to the extent that it establishes the FOP as the exclusive bargaining representative of all Capitol Police Officers employed in Harrisburg and the state office buildings in Philadelphia and Pittsburgh. The order is reversed, however, insofar as it establishes the FOP as the representative of those police officers employed in the state office buildings in Scranton for the reasons set forth herein.

ORDER

The Pennsylvania Labor Relations Board Final Order, Case No. PF-R-4-C, dated June 27, 1980, is affirmed as to the certification of the Fraternal Order of Police, Lodge No. 85, as the exclusive representative for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment for all full-time and regular part-time Capitol Police Officers, including Police Officers IV, Police Officers III, Police Officers II and Police Officers I, employed in Harrisburg and the

---

[44] The record establishes that "Police Officers" are employed by at least ten Commonwealth agencies, with each agency exercising exclusive control over its respective security personnel. In addition, each agency promulgates its own policy, and the Capitol Police do not have supervisory authority over Police Officers in other agencies. We further note that the issue before the Board was the status of the *Capitol Police* as "policemen" under Act 111, and not the status of the civil service classification "Police Officer."

state office buildings in Philadelphia and Pittsburgh. The Final Order is reversed as to the certification of the Fraternal Order of Police, Lodge No. 85, as the exclusive bargaining representative of all such Capitol Police Officers employed in the state office buildings in Scranton.

Judge PALLADINO did not participate in the decision in this case.