Joint Bargaining Committee of the Pennsylvania Social Services Union et al., Petitioners v. Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board, Respondent. Commonwealth of Pennsylvania, Intervenor.

Argued March 2, 1982, before President Judge CRUMLISH and Judges ROGERS, BLATT, MACPHAIL and DOYLE.

*Bruce M. Ludwig, Stephen A. Sheller & Associates,* for petitioner.

*Anthony C. Busillo, II,* with him *James L. Crawford,* for respondent.

*Robert J. Schwartz,* Assistant Attorney General, with him *John D. Raup,* Chief Counsel, and *Thomas H. Lane, Morgan, Lewis & Bockius,* for intervenor.

OPINION BY JUDGE DOYLE, August 13, 1982:

Before this Court is an appeal by the Joint Bargaining Committee of the Pennsylvania Social Ser-

vices Union and Pennsylvania Employment Security Employees' Association, Affiliates of Service Employees International Union, AFL-CIO (Union) from a final order of the Pennsylvania Labor Relations Board (PLRB) holding that the Commonwealth of Pennsylvania has not committed an unfair labor practice in violation of Sections 1201(a)(1) and (5) of the Public Employe Relations Act (PERA)[1] by refusing to engage in good faith collective bargaining with the Union with regard to the workload of caseworkers of the Department of Public Welfare (Department). We affirm the decision of the PLRB.

The initial unfair labor practices charge in this matter was filed with the PLRB by the Union[2] on February 22, 1973. A hearing was held and on January 4, 1974, the PLRB issued a decision holding that employee caseload[3] was a matter of inherent managerial policy, the refusal to bargain over which was not an unfair labor practice pursuant to Section 702 of the

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§1101.1201 (a)(1) and 1101.1201(a)(5). These sections provide:

(a) Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

. . . .

(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

[2] A duly certified employee organization.

[3] The terms "caseload" and "workload" have been used interchangeably throughout these proceedings. The Union, however, has been careful to emphasize that its concerns herein do not lie in absolute numbers of cases but in the total amount of actual work required of each employee.

PERA,[4] as opposed to which it would be were this deemed a subject for which collective bargaining was mandatory under Section 701 of the PERA.[5] The PLRB's decision was appealed to this Court and, in *Pennsylvania Social Services Union v. Pennsylvania Labor Relations Board,* 15 Pa. Commonwealth Ct. 441, 325 A.2d 659 (1974), we affirmed the PLRB's holding. The Pennsylvania Supreme Court, however, in *Pennsylvania Social Services Union v. Pennsylvania Labor Relations Board,* (No. 68 May Term 1975, filed October 7, 1977), a *per curiam* decision, vacated the decisions of the PLRB and this Court and remanded the case to the PLRB for further proceedings in light of the Supreme Court's decision in *Pennsylvania Labor Relations Board v. State College Area School District,* 461 Pa. 494, 337 A.2d 262 (1975).

On January 5, 1978, the Supreme Court denied an application for reargument and reconsideration filed

---

[4] 43 P.S. §1101.702 reads:

Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

[5] 43 P.S. §1101.701 reads:

Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

by the PLRB and the PLRB then conducted an additional hearing on April 5, 1978. The PLRB, on August 6, 1979, issued a Nisi Decision and Order wherein it found workload to be a subject for mandatory collective bargaining and the Commonwealth's refusal to negotiate regarding the same to be an unfair labor practice pursuant to Sections 1201(a)(1) and (5) of the PERA. Exceptions were filed to this decision by the Commonwealth and, following oral argument, the PLRB issued a Final Order on February 5, 1981. This order vacated the conclusions of the Nisi Decision and Order, and found the Commonwealth not to have engaged in unfair labor practices.

In its appeal to this Court, the Union alleges, *inter alia:* (1) that the PLRB's conclusion is erroneous as a matter of law in that the PLRB failed to apply the test set forth by the Supreme Court in *State College* for determining when a matter is bargainable under Section 701 or not bargainable under Section 702; (2) that the evidence presented requires a conclusion, pursuant to *State College,* that workload is a subject for mandatory collective bargaining; and (3) that the PLRB presented insufficient grounds for reversing its Nisi Decision and Order and that the reversal was thus arbitrary, capricious and unreasonable.

It is well settled that this Court's scope of review of determinations of the PLRB is limited to determining whether the findings of fact are supported by substantial evidence and whether the conclusions drawn from those findings are reasonable and not arbitrary, capricious or incorrect as a matter of law. *Commonwealth v. Pennsylvania Labor Relations Board,* 64 Pa. Commonwealth Ct. 525, 441 A.2d 470 (1982). It is the function of the PLRB, not this Court, to resolve conflicts in the evidence presented, to assess the credibility of witnesses, to resolve primary issues of fact and to draw the inferences from the facts necessary

for a resolution of the complaint. *Appeal of Cumberland Valley School District,* 483 Pa. 134, 394 A.2d 946 (1978). Moreover, the PLRB, by virtue of its experience and expertise, is better qualified than the courts to address the complexities of disputes of this nature and, therefore, the courts should not lightly substitute their judgment for that of the PLRB. *Community College of Philadelphia v. Pennsylvania Labor Relations Board,* 60 Pa. Commonwealth Ct. 629, 432 A.2d 637 (1981), aff'd. 496 Pa. 415, 437 A.2d 942 (1981); *Appeal of Cumberland Valley School District.*

In *State College,* the Supreme Court addressed the distinction between matters which are the subject of mandatory collective bargaining under Section 701 of the PERA and those which are excludable from the bargaining process under Section 702. Items affecting wages, hours and other terms and conditions of employment but not touching on matters of inherent managerial policy were considered clearly bargainable. Where, however, a matter affects wages, hours and other terms and conditions of employment and also affects decisions involving inherent managerial policy, *i.e.,* a conflict between Sections 701 and 702, the Court, rather than afford priority to Section 702 by holding such a matter to be automatically excludable from the bargaining process, cited to the legislative purpose behind the PERA of attempting to restore harmony to public sector labor relations and stated:

> we hold that where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the Board in the first instance and the courts thereafter to determine whether the impact of the issue on the

interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole. If it is determined that the matter is one of inherent managerial policy but does affect wages, hours and terms and conditions of employment, the public employer shall be required to meet and discuss such subjects upon request by the public employe's representative pursuant to section 702.

*Id.* at 507, 337 A.2d at 268.[6]

Thus, the PLRB must conduct a balancing test in which it weighs the interest of the employer in terms of the matter's affect on the program as a whole against that of the employees of having it dealt with in the collective bargaining agreement.

At the hearings held before the PLRB, the Union presented testimony to illustrate the impact on terms and conditions of employment of the system currently utilized by the Department of Public Welfare for allocating workload assignments. This system, under which cases and corresponding responsibilities are assigned on a geographic basis,[7] leads to inequities in the amount of work required to be performed as between certain similarly classified employees of the Department with various detriments accruing to those employees burdened with the comparably greater

---

[6] Section 301(17) of the **Public Employe Relations Act, 43 P.S.** §1101.301(17) defines "meet and discuss" as being

the obligation of a public employer upon request to meet at reasonable times and discuss recommendations submitted by representatives of public employes: Provided, That any decisions or determinations on matters so discussed shall remain with the public employer and be deemed final on any issue or issues raised.

[7] For employees of various state hospitals, the geographic distribution relates to the confines of the institution.

workloads. These detriments allegedly include: poor performance evaluations because of an inability to complete assigned work; having to take work home in the evenings or work through breaks to meet time constraints as to necessary work; frustration, discouragement and loss of morale because of workload pressures; higher error rates from attempting to accomplish too much work in too little time which can lead to retraining, reassignment or disciplinary action, and, a loss of promotional opportunities resulting from an employee advancement policy which is purportedly unfair and discriminatory because it fails to take into account the impact of the disparate workload assignments.

The Commonwealth, in turn, presented evidence which it considered illustrative of the significant interest of the Commonwealth in having workload declared a matter of inherent managerial policy exempt from collective bargaining. The focus of the Commonwealth's presentation was that the primary task of the employees herein involved[8] is casework and that a great deal of variety exists from one case to another in terms of requirements and duties and procedures. Ostensibly, the degree of work required differs from case to case, even among those cases in the same basic categories and is incapable of being readily standardized. It was further contended that this inherent variability combined with the need to meet sundry and ever changing standards and requirements imposed by the federal government as a prerequisite to the Commonwealth's receipt of vital funding, and the need to meet contingencies arising from fluctuations in unemployment and catastrophies such as floods or fires, creates

---

[8] The classification of the employees represented by the Union in this matter includes assistant technicians, caseworkers, therapeutic activities worker-recreational and psychological associates.

a great need for flexibility for the Department to be able to accomplish its function as a service provider— flexibility already severely restricted by time constraints imposed by law and shrinking tax dollars which limit the ability of the Department to acquire additional resources and personnel. Thus, the Commonwealth posits that requiring collective bargaining as to workload in this instance could further constrain administrative flexibility so as to have a severe and detrimental impact on the Department's overall budget, its standards of service, its organizational structure and its selection and direction of personnel. *See* Section 702 of the PERA. Additionally, the Commonwealth contests the Union's assertion that its employee advancement policy discriminates against personnel who are subjected to greater workloads.

Confronted with the above evidence and arguments, the PLRB concluded, in pertinent part:

The decision for a public employer to become involved in providing a social service is one which is usually made as a political decision or as a result of legislative mandate. This is one of the major factors which distinguishes public employers from private employers. Having made the decision to offer a service, a public employer does not lightly abandon such service. In addition, once having entered into the provision of a service, a public employer many times does not have a self determined workload. Cases are generated from a society to a governmental agency without a significant amount of control on the part of the public employer as to the cases which will constitute the workload of a given agency. The only means by which a public employer may adjust a social services workload are means which impact heavily on managerial prerogatives.

. . . .

The public policy impacts of caseload adjustments coupled with the recognized practical difficulties of standardizing cases, leads this Board, upon thoughtful review, to reconsider its prior evaluation of the relative impacts of the workload issue on the public employer and the public employe. In so doing, the Board must be especially cognizant of the distinction between public employers and private employers and the direction given by the PERA to protect the rights of the public employer, the public employe and the public at large.

. . . .

Although the Supreme Court in State College has indicated that an issue is not necessarily reserved to management simply because it "touches on policy," this Board recognizes that workload adjustments do not simply touch on policy in an indirect way, but would be directly determinative of policy particularly in the reserved areas of standards of service and selection and direction of personnel.

[W]e [thus] believe that establishment of caseload maxima is a managerial prerogative over which management is not by law required to bargain. The establishment of caseload maxima is a subject over which the public employer shall be required to meet and discuss upon request by the bargaining representative.

After a careful review of the record herein, we conclude that the PLRB's holding in this matter complies with the mandates of the Supreme Court's remand order and is not in error. Nor do we believe that the reversal of the Nisi Decision and Order was arbitrary, capricious and unreasonable. The determination made

by the PLRB in the instant case, pursuant to the guidelines set forth by *State College*, is one of fact, *i.e.*, where does the greatest impact of negotiating workload lie based on the evidence presented *in this case*.[9] The only remedy which the Union could obtain through bargaining over workload for the alleged detriments to its members resulting from the current system for determining workload would be to standardize the same. The evidence presented by the Commonwealth, however, is sufficiently supportive of the conclusion that the adjustments which would of necessity flow from any effort to standardize the workloads of the employees on behalf of whom the Union seeks to negotiate, employees who are professionals,[10] would have a direct and substantial impact on the operations of the Department of Public Welfare and its ability to carry out its primary functions. Conversely, the impact of the workload determination process itself with respect to the Union's negotiable interest in wages, hours, and terms and conditions of employment can

---

[9] Accordingly, we are *not* addressing the concept of the negotiability of workload in general. It is conceivable that, under certain circumstances, the impact of workload assignments on the negotiable interests of particular employees may be sufficient to require a conclusion that workload, or some aspect thereof, is subject of mandatory collective bargaining. *See West Hartford Education Association v. DeCourcy*, 162 Conn. 566, 295 A.2d 526 (1972).

[10] We feel it is noteworthy that Section 301(7) of the Public Employe Relations Act, 43 P.S. §1101.301(7), defines a "professional employe" as being

> any employe whose work: (i) is predominantly intellectual and varied in character; (ii) requires consistent exercise of discretion and judgment; (iii) requires knowledge of an advanced nature in the field of science or learning customarily acquired by specialized study in an institution of higher learning or its equivalent; and (iv) *is of such character that the output or result accomplished cannot be standardized in relation to a given period of time.* (Emphasis added.)

justifiably be considered indirect. As stated by the PLRB:

> once this decision [as to workload] is made the employer shall be required to collectively bargain those matters which directly impact on employe wages, hours and terms and conditions of employment. *Thus the matters which lie at the heart of this action are mandatory subjects of bargaining.* Areas of demotion, promotion and health and safety are proper subjects of collective bargaining and, incorporated in a collective bargaining agreement, provide protection against the evils the union seeks to combat. Thus employes who are passed over on promotion because of inability to complete paperwork or make client visits because of excessive workloads can successfully grieve discriminatory action. Those who are demoted for the same reasons could similarly grieve their plight. It is also well within the bounds of mandatory negotiation for the union to negotiate premium pay for heavy workloads or overtime pay for work beyond the established workweek. (Emphasis added.)

We agree with this analysis. *See Canon-McMillan School Board v. Commonwealth,* 12 Pa. Commonwealth Ct. 323, 316 A.2d 114 (1974).

In light of our scope of review and viewing the substantial evidence in support of the PLRB's conclusions as to the directness and significance of the impact of negotiating workload on the employer as opposed to the indirectness on the interests of the employees and the latters' ability to protect their interests, at least in part, by alternative means and, whereas, "the paramount concern [of the PLRB] must be the public interest in providing for the effective and efficient performance of the public service in ques-

tion[,]" *State College* at 506, 337 A.2d at 268, we affirm the PLRB's conclusion that the impact of requiring collective bargaining over workloads would be greater on the pertinent interests of the Commonwealth than on those of the employees and that the Commonwealth has therefore not committed an unfair labor practice by refusing to engage in collective bargaining over the subject of workload in this instance.

ORDER

Now, August 13, 1982, the Final Order of the Pennsylvania Labor Relations Board in the above captioned matter, Case No. PERA-C-3157-C, dated February 5, 1981, is hereby affirmed.

Judge MENCER did not participate in the decision in this case.