DALTON POLICE ASSOCIATION, Petitioner,

v.

PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 4, 2000.

Decided Jan. 11, 2001.

James L. McAneny, Harrisburg, for petitioner.

John B. Neurohr, Harrisburg, for respondent.

Before COLINS, Judge, PELLEGRINI, Judge and NARICK, Senior Judge.

PELLEGRINI, Judge.

Dalton Police Association (Association) appeals from an order of the Pennsylvania Labor Relations Board (Board) finding that James Gray, the Chief of Police of Dalton Borough (Chief), as a managerial employee was excluded from the collective bargaining unit certified by the Board to represent police officers under Act 111.

On October 20, 1999, the Association filed a petition for representation with the Board pursuant to Section 7(c) of the Pennsylvania Labor Relations Act[1] and Act 111 of 1968[2] seeking to represent a bargaining unit of all non-managerial police employees which was to include the full-time chief of police position. The Dalton Borough Police Department consisted of five officers, including the Chief, who was its only full-time employee. Because Dalton Borough (Borough) did not agree that the chief of police should be part of the bargaining unit, the Board heard evidence to determine whether the Borough's chief of police position was managerial in nature.[3]

---

1. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.7(c), provides as follows:

(c) Whenever a question arises concerning the representation of employees the board may, and, upon request of a labor organization, or an employer who has not committed an act herein defined as unfair labor practice, or any group of employes in an appropriate unit representing by petition thirty per centum or more of the employes of that unit, shall investigate such controversy and certify to the parties, in writing, the name or names of the representatives who have been designated or selected. In any such investigation, the board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section eight, or otherwise, and may utilize any suitable method to ascertain such representatives, except that if either party to the controversy so requests, a secret ballot of employes shall be taken within twenty days after such request is filed. Any certification of representatives by the board shall be binding for a period of

one year, or for a longer period if the contract so provides, even though the unit may have changed its labor organization membership.

2. Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10. Although Act 111 does not contain detailed provisions for the selection of a bargaining representative, our Supreme Court has held that Act 111 is to be read *in pari materia* with the Pennsylvania Labor Relations Act. *Philadelphia Fire Officers Assoc. v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977).

3. On November 9, 1999, the Secretary of the Board issued an order and notice of hearing in which the matter was assigned to a pre-hearing conference to resolve the matters in dispute through mutual agreement of the parties. Because the parties could not reach a resolution as to the disputed matters, a hearing was conducted on December 16, 1999. As to the issues before the hearing examiner,

Contending that the chief of police was a manager, the Borough offered the testimony of Susan Stacknich, the Borough's Secretary/Treasurer, whose responsibilities included the processing of payroll for the police department. As to payroll, Ms. Stacknich stated that prior to the Borough's implementation of a time clock, the Chief provided her with time sheets for each part-time police officer that were filled out and signed by him. In addition, he would submit a month-end calendar for himself. However, since time clocks were instituted, the Chief's main involvement with payroll was to clear up any discrepancies on the time card with regard to differing duties performed by officers during their hourly shifts that would, in turn, affect their pay scale. Moreover, she stated that although the Chief was a salaried employee, he, too, was required to punch the time clock and was paid compensation time for any hours worked over the 40 hour work week.

Lorraine M. Daniels, vice president of Borough Council and chairperson of the Finance Committee and member of the Safety Committee, testified as to the Chief's responsibilities in preparing the police department's budget, purchasing and personnel. She testified that the Chief submitted a line item budget to the Finance Committee for review, and that the Finance Committee has never changed or rejected a budget that the Chief has submitted. Further, she testified that the Chief was able to make purchases as listed on the line item budget without prior Borough Council approval. As to the Chief's participation in the hiring of police personnel, Ms. Daniels testified that the Chief collected resumes which he and the Mayor reviewed and subsequently made recommendations to the Safety Committee. Ms. Daniels noted that the Chief's recommendations were always approved by the Safety Committee.

The current Mayor of Dalton Borough, John Hobert, testified as to his interactions with the Chief while serving as the liaison between the police department and the Borough Council. He testified that although he was not directly involved in the scheduling process, he received the schedule for the police department as prepared by the Chief based on his position as the liaison between the police department and Borough Council. Moreover, the Mayor testified that he deferred to the Chief's judgement concerning the budgetary needs of the police department and the Chief was able to purchase what he needed. In addition, the Mayor stated that on one occasion, the Chief had asked him if he could purchase tires at which time the Mayor deferred to the Chief's judgment and granted his request. The Chief had also asked to purchase a VASCAR unit (a speed detection device) from grant monies which the Mayor approved without prior approval from Borough Council.

Contending that the chief of police's position was not managerial in nature and should be included in the bargaining unit, the Association presented the testimony of former Mayor Daniel Ranlet, who was appointed to Borough Council in 1989 and served as Mayor from 1992 until July 1999. Mr. Ranlet stated that because of manpower shortages, the Chief had worked a significant amount of overtime, and to correct this, the Mayor sought more money from Borough Counsel to increase personnel for the police department. Further, because of his concern over the Chief working long hours, he required the Chief to seek approval for overtime hours. Mr. Ranlet also testified that he always deferred to the Chief with regard to the placement of officers and on only one occasion directed the Chief to change staff positioning. As to the budgetary process, Mr. Ranlet stated that the Chief would submit a proposed

in addition to the issue of whether the Chief was to be included in the bargaining unit, a separate issue in dispute was whether a part-time position held by Officer Leonard Kowal-ski was a regular part-time position as defined by the Board. Because this issue has no bearing on the instant action, it will not be addressed in the Court's opinion.

budget that they would review together. Mr. Ranlet also noted that the Chief was able to purchase what he needed for the police department and the Chief only sought his approval on major items. Mr. Ranlet also noted that there was only one time when he refused the Chief's purchasing request for a TV/VCR for public relations reasons. Moreover, when the Borough decided to purchase a new police cruiser, the Chief was responsible for identifying the car that suited the police department's needs. With respect to grant monies, Borough Council approval was necessary for expenditures from this fund. Mr. Ranlet also stated that the Chief was the individual responsible for informing him as to updates needed in the Police Policy Manual and the Chief would write these updates which the former Mayor would forward to Borough Council.

Also, before the hearing examiner, the Chief testified as to his duties. The Chief stated that he began working as chief of police for the Borough in 1983 and was responsible for the scheduling of all officers under his command. He further stated that the Mayor informed him to control overtime hours for the force and that he was required to seek the Mayor's approval if he needed to work overtime hours. Moreover, when presented with a listing of 21 duties for the chief of police from the Police Procedure Manual, the Chief stated that he was unsure as to what a procedure regarding developing new techniques and improving the effectiveness of the police department involved, and as to the task of preparing and presenting a budget to Borough Council, the Chief stated that he did not perform that task because he had worked with the Mayor on the budgetary process.[4]

With respect to disciplining police officers under his command, the Chief stated that if there was a problem, he would sit the officer down and reprimand them, but if the situation warranted more, the Mayor would become involved. The Chief noted two incidents regarding reprimand that had occurred, one in which he reprimanded an officer who failed to work a

---

4. Specifically, the duties of the chief of police as stated in the Police Procedure Manual are as follows:

1. The enforcement of all rules, regulations, general and special directives;
2. The organization and control of all resources of the department for the most efficient use in preserving the peace, the protection of persons and property, and the enforcement of new laws;
3. The development of an organizational structure of the Police Department, including accountability of all subordinate officers with whom areas of responsibility have been vested;
4. The assignment of duties of all officers as well as scheduling of hours for regular duty;
5. The improvement of employee working conditions to achieve maximum efficiency and high morals;
6. To advise the Mayor and Borough Council of recommended revisions to existing ordinances and/or enactment of new ordinances to benefit the Borough;
7. To formulate continuing training programs for the Police Department;
8. To develop new techniques and improve the effectiveness of the Police Department;
9. To recognize the outstanding performance of Officers;
10. To evaluate the Police Officers and affairs of the Police Department;
11. To provide continual observations of every phase of Police activity;
12. To advise the Mayor of any incidents or circumstances which might injure the integrity of the Department;
13. To promote public relations;
14. To release accurate information to the public and to the news media;
15. To create and maintain an alliance with other governmental agencies;
16. To conduct periodic meetings with the Department personnel and to resolve problems and disseminate information;
17. To prepare and present to Borough Council a budget, or budget estimate which reflects the needs of the Department;
18. To implement and maintain personnel records, including personnel evaluations;
19. To perform any other such duties as might be assigned by the Mayor;
20. To discipline subordinate Police Officers and prepare records in this regard; and
21. To perform all such duties and meet all requirements as set forth.

scheduled shift and, in turn, the officer subsequently resigned. As to the other incident, the Chief suggested that the Mayor suspend an officer involved in an off-duty shooting incident at which time the Mayor asked for the officer's suspension.

With respect to the implementation of the Police Procedure Manual, the Chief stated that he and the former Mayor, Ron Leas, contacted the Department of Community Affairs for information regarding the manual and he took samples of model policy information from the information he received. The Chief stated that he provided the manual to the Mayor for his review, which was subsequently forwarded to Borough Counsel for approval.[5] In addition to this testimony, the Chief noted that there has never been an officer hired without his recommendation, that he can buy office supplies without prior approval from the Mayor, and that he was involved with implementing differing police programs for community awareness and public safety.

Applying the test set forth in *Fraternal Order of Police Lodge No. 20 v. Pennsylvania Labor Relations Board*, 104 Pa. Cmwlth. 561, 522 A.2d 697 (1987), *affirmed*, 522 Pa. 149, 560 A.2d 145 (1989) (*Star Lodge* ), the hearing examiner found that the position of chief of police was managerial in nature because the Chief exercised independent and effective mana-gerial authority in the areas of overall personnel administration responsibility, policy formulation and purchasing.[6] Specifically, with respect to overall personnel administration, the hearing examiner found that the Chief exercised managerial prerogatives because he coordinated all scheduling of part-time officers, was responsible for verifying payroll for the Borough Secretary/Treasurer, recommended discipline for police officers as evidenced on two occasions when he recommended suspension for an officer and on another occasion when he allowed an officer to resign as opposed to being disciplined or fired. Further, the hearing examiner found that the Chief was jointly responsible with the Mayor for the hiring of new employees and collected resumes and made recommendations for new hires which were always honored.

As to the Chief's managerial responsibilities in the area of policy formulation, the hearing examiner concluded that the Chief exercised managerial prerogatives here as well because, while working with the Mayor, the Chief obtained sample manuals from the Department of Community Affairs for the adoption of a Police Procedure Manual which he subsequently presented to the Borough Council's Police Committee for approval and recommended additions to the manual that were approved and made part of the manual.

---

5. The Chief could not recall if the Mayor had made changes to the manual when he presented it to him.

6. In *Star Lodge*, this Court held that a position should be classified "as managerial when the named function is affirmatively among the powers of the position, and...supervisory when the function is absent from those powers." *Id.* at 704. Accordingly, this Court concluded that if a position encompasses decisional authority in any of the following areas, that position will be identified as managerial. These areas included:

Policy Formulation—authority to initiate departmental policies, including the power to issue general directives and regulations;
Policy Implementation—authority to develop and change programs of the department;

Overall Personnel Administration Responsibility—as evidenced by effective involvement in hiring, serious disciplinary actions and dismissals;
Budget Making—demonstrated effectiveness in the preparation of proposed budgets, as distinguished from merely making suggestions with respect to particular items;
Purchasing Role—effective role in the purchasing process, as distinguished from merely making suggestions; and
Independence in Public Relations—as evidenced by authority to commit departmental resources in dealing with public groups.
*Id.* at 705.

Finally, as to the Chief's managerial role in the area of purchasing, the hearing examiner found that the Chief exercised managerial prerogatives because he was independently responsible for purchasing items and materials for the operation of the police department, and although some requests for purchases were denied, he purchased such items as automobile tires for police vehicles. Further, the Chief was responsible for handling the purchase of a new police cruiser and selected the specifications for this vehicle. In addition, the hearing examiner found that the Chief purchased items from a crime prevention grant which included a new VASCAR unit for which the Chief did not obtain prior approval from the Mayor to purchase.

Upon the hearing examiner's order, the Association filed a list of employees included in the bargaining unit that the hearing examiner had deemed appropriate. The Board Representative then issued an order and notice of election directing an election to be conducted on March 22, 2000, among full and part-time regular employees of the police department, excluding the Chief. The election was conducted at which time

the appropriate bargaining unit voted in favor of the Association by a vote of 4–0. The Board Representative then issued a nisi order of certification, certifying the Association as the exclusive bargaining representative of the Borough's bargaining unit but excluding the Chief from this unit.

The Association then filed exceptions to the nisi order of certification alleging that the hearing examiner erred in making various findings of fact and in concluding that the Chief was excluded from the collective bargaining unit. The Board via final order amended two of the hearing examiner's findings of fact,[7] but concluded that "in the main", the hearing examiner's findings were supported by substantial evidence of the record and, as such, adopted the hearing examiner's other findings and conclusion that the chief of police position in the Borough was managerial under the *Star Lodge* analysis. The Board dismissed the Association's exceptions and affirmed the nisi order of certification. This appeal followed.[8]

The Association contends that the Board erred in excluding the Chief from

7. Finding of Fact No. 14 provided:
  The chief is the one person responsible for verifying the payroll to the Borough Secretary Treasurer prior to payroll checks being issued. Sue Stacknich, the Borough Secretary Treasurer, is the only paid administrative employe of the Borough.
  As amended by the Board, Finding of Fact No. 14 provided:
  That prior to September 1999, the chief of police was responsible for verifying the payroll records of all police officers to the Borough secretary/treasurer prior to payroll checks being issued. Sue Stacknich, the Borough secretary/treasurer, is the only paid administrative employe of the Borough. Since September 1999, the secretary/treasurer gathers the pay information directly from the time cards. The chief would inform the Borough secretary/treasurer in the event an employe required a different pay scale as a result of time spent either attending court or on duty as part of a drug task force.
  Finding of Fact No. 15 provided:
  The chief is responsible for recommending discipline of officers. As an example

of this he was responsible for investigating an officer who the Chief believed had falsely stated he was working hours for the Borough. Following the meeting with the officer, the chief gave him the chance to resign as opposed to being disciplined or fired.
  As amended by the Board, Finding of Fact No. 15 provides:
  The chief is responsible for recommending discipline for officers. For example, the chief arranged a meeting with an officer who failed to work a scheduled shift for the Borough. At that meeting, the chief gave the officer the chance to resign as opposed to being disciplined.

8. Our scope of review regarding an adjudication of the Pennsylvania Labor Relations Board is limited to determining whether there was a violation of constitutional rights, whether there was an error of law, or whether the Board's findings of fact are supported by substantial evidence. *State System of Higher Education v. Pennsylvania Labor Relations Board*, 737 A.2d 313 (Pa.Cmwlth.1999).

the bargaining unit and in concluding that his position met three of the six indicia of managerial authority established in *Star Lodge*, because the hearing examiner's findings of fact, as adopted by the Board, were not supported by substantial evidence of record. Specifically, the Association asserts that the Board erred in determining that a chief of police, in a department consisting of five officers, four of which are part-time, who never issued a single general order, was not allowed to change a policy or program, who was required to punch a time clock and could not purchase anything more than office supplies and tires, was a managerial employee under Act 111.

In determining whether to include certain members of police and fire departments in the collective bargaining unit under the *Star Lodge* criteria, it is more difficult to exclude a position from the collective bargaining unit because those criteria focus on what discretion is exercised by a person who is occupying a position in certain areas rather than on the type or number of employees supervised in the field or the critical nature of those duties. Because even first level supervisors are not part of the "rank and file" collective bargaining unit under "normal" labor relations principles,[9] the distinction between managerial and supervisory is not that crucial. Consequently, because supervisors are members of the "rank and file" collective bargaining unit, in applying the *Star Lodge* criteria, we have held that in a fire department with well over 1,000 employees, only three employees were managerial because the rest of the officers in the department were classified as supervisory. *See City of Pittsburgh v. Pennsylvania Labor Relations Board*, 124 Pa. Cmwlth. 502, 556 A.2d 928 (1989). Making this analysis even more difficult is the variety of differing forms of local government which give elected officials, as is proper, control over the police department. Depending on the type of person(s) who serve as member(s) of council, supervisor(s) or the Mayor,[10] not to mention civil

---

**9.** *See West Perry School District v. Pennsylvania Labor Relations Board*, 752 A.2d 461 (Pa. Cmwlth.2000).

**10.** The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. § 46121, provides in pertinent part:

Borough council may, subject to the civil service provisions of this act, if they be in effect at the time, appoint and remove, or suspend, or reduce in rank, one or more suitable persons, citizens of the United States of America, as borough policemen, who shall be ex officio constables of the borough, and shall and may, within the borough or upon property owned or controlled by the borough or by a municipal authority of the borough whether such property is within outside the limits of the borough, without warrant and upon view, arrest, and commit for hearing any and all persons guilty of breach of the peace, vagrancy, riotous or disorderly conduct or drunkenness, or who may be engaged in the commission of any unlawful act tending to imperil the personal security or endanger the property of the citizens, or for violating any ordinance of the borough for the violation of which a fine or penalty is imposed, and notwithstanding any statute pertaining to the same or similar offenses. Any person so arrested shall be received for confinement by the keepers of the jails, lockups, or station houses within the county.

*The borough council may designate one of said policemen as chief of police. The mayor of the borough shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties, except that council shall fix and determine the total weekly hours of employment that shall apply to the policemen.*

Policemen shall have authority to serve and execute all criminal process for the violation of borough ordinances which may be issued by the mayor, and shall charge the same fees and costs as constables of the borough, but such fees and costs shall be collected by the mayor and by him paid into the borough treasury.

The borough may, by ordinance, establish a police department consisting of chief, captain, lieutenant, sergeants, or any other classification desired by the council, and council may, subject to the civil service provisions of this act, if they be in effect at the time, designate the individuals assigned to each office, but the mayor shall continue

service commissions who do the actual selection of candidates, the chief of police may have more or less control over a police department under the *Star Lodge* criteria than other chiefs of police operating in the same or differing forms of government.

■ While this is a close case, the Board's finding that the Chief exercised managerial control is supported by the record because there exists substantial evidence that the Chief had extensive purchasing responsibilities as he could purchase items without Borough Council's approval, personnel responsibilities because he recommended who was to be hired, and policymaking functions because he formulated the Police Procedure Manual, not to mention his day-to-day control over the interworkings of the police department. Even though, as the Association points out, there are substantial factors that could support an opposite finding that the Chief was not a managerial employee and merely a supervisor, because the Board possesses administrative expertise in the field of public employee labor relations, we decline to interfere with its judgment where its conclusions are not arbitrary or capricious, but can reasonably be drawn from facts supported by the record. *West Hanover Township v. Pennsylvania Labor Relations Board,* 166 Pa.Cmwlth. 260, 646 A.2d 625 (1994). Moreover, it is also the function of the Board and not this Court "to resolve conflicts in the evidence presented, to assess the credibility of witnesses, to resolve primary issues of fact and to draw the inferences from the facts necessary for a resolution of the complaint." *Joint Bargaining Comm. of the Social Services Union v. Pennsylvania Labor Relations Bd.,* 68 Pa.Cmwlth. 307, 449 A.2d 96 (1982).

Accordingly, in light of these well established principles and because there was substantial evidence to support the Board's decision that the Chief is a managerial employee who should be excluded from the collective bargaining unit, the Board's order is affirmed.

### ORDER

AND NOW, this 11th day of January, 2001, the Order of the Pennsylvania Labor Relations Board dated May 16, 2000, is affirmed.

to direct the manner in which the persons assigned to the office shall perform their duties. *The mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their* duties. *The mayor may appoint special policemen during an emergency in which the safety and welfare of the borough and the public is endangered and auxiliary policemen may be appointed as provided by general law.* [Emphasis added.]